UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAYMOND G.,[1]

        Plaintiff,

   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Case No. 18-cv-05576-TSH

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 17

## I.    INTRODUCTION

Plaintiff Raymond G. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Commissioner of Social Security, the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 15 (Pl.'s Mot.), 17 (Def.'s Mot.).  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **DENIES** Plaintiff's motion and **GRANTS** Defendant's cross-motion for the following reasons.

## II.    BACKGROUND

### A.    Age, Education and Work Experience

Plaintiff is 48 years old.  AR 39.  For several years as a child, Plaintiff was sexually abused by his father.  AR 380, 446, 454, 578, 580, 669.  As a sixth-grader, he suffered a severe head

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

injury after he ran full speed and head first into a tether ball pole while trying to catch a football. AR 666.  Prior to this accident, Plaintiff performed well in school but after, life became more unstable and he began using illicit substances in the eighth grade.  *Id.*  Plaintiff dropped out of high school his junior year to enroll in a drug treatment program for youth.  AR 668.  He never earned his high school diploma or GED.  *Id.*  Plaintiff has a long history of heavy substance use beginning as a youth all the way into adulthood, including use of marijuana, amphetamines, and cocaine.  AR 667.  His substance use led to two psychiatric hospitalizations in 2011.  *Id.*

Plaintiff has a long history of obtaining jobs but not being able to sustain them for very long due to his inability to interact appropriately with coworkers and supervisors.  AR 50, 53, 194-213, 242.  He has not worked at levels representing substantial gainful activity since 2011 and last worked briefly in 2015.  AR 212-13.  Plaintiff has described his primary barriers to working as being anger issues, social anxiety, and side effects from his psychiatric medication.  AR 66, 72-73. 83-86.

**B.      Medical Evidence**

**1.      Dr. Montgomery**

Plaintiff began working with psychiatrist Charles Montgomery, M.D. on November 11, 2010 and has generally remained in his care through at least March 30, 2017.  AR 380-413, 466-70, 657-64, 679-80.  Plaintiff's symptoms documented by Dr. Montgomery include paranoia, disorganized behavior, panic attacks, history of auditory hallucinations, drug history, history of explosive anger and aggressive outbursts, anxiety, impaired concentration and attention, depression, instability of interpersonal relationships, suspiciousness of others, and a history of nightmares.  AR 380-413, 466-70, 657-64, 679-80.

In a February 2017 assessment, Dr. Montgomery noted that Plaintiff experienced a "partial" response to medication treatment, including Abilify, Zoloft, and Klonopin, but also experienced drowsiness as a side effect; experienced labile mood swings from depression to mania; experienced difficulty consistently engaging with treatment; and that his primary diagnosis is bipolar disorder, type I.  AR 466, 469-70.  Dr. Montgomery opined that Plaintiff would have "marked" limitations in the following abilities: describing work activity to someone else;

identifying and solving problems; sequencing multi-step activities; handling conflicts with others; understanding and responding to social cues; keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; completing tasks in a timely matter; ignoring or avoiding distractions; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; adapting to changes; managing psychologically-based symptoms; distinguishing between acceptable and unacceptable work performance; making plans independently of others; and being aware of normal hazards and taking appropriate precautions.  AR 467, 469.

Dr. Montgomery's treatment notes also note that Plaintiff has logical thought process, no hallucinations, and good memory.  AR 392-400, 404-13, 659-64.  In treatment notes post-dating Plaintiff's alleged disability onset date, Dr. Montgomery observed "flat affect" on a number of occasions, but consistently found "appropriate affect" in mental status examinations after March 2016.  AR 404-13, 659-64.  Dr. Montgomery also consistently found Plaintiff had normal appearance, cooperative behavior, normal speech, intact associations, good "fund of knowledge," euthymic mood (at times), and he was oriented to person, place, and time.  AR 392-400, 404-13, 659-64.  Dr. Montgomery noted Plaintiff had normal gait and station.  AR 392-400, 404-13, 659-64.  Dr. Montgomery kept Plaintiff on the same medication regimen (Klonopin, Zoloft, and Abilify) since October 2014 and kept him on the same doses of those medications since September 2015.  AR 384, 392-400, 404-13, 659-64.  Plaintiff reported "improved depression," an improved depressed mood, being "not as down," or "partial improvement [in] depression and mood swings" at various appointments with Dr. Montgomery.  AR 392-95, 407-09, 662-63.

Plaintiff first complained of PTSD to Dr. Montgomery in March 2016.  AR 404.  He stated that the triggering traumatic event occurred four years prior, when a drug dealer in Las Vegas accused him of being an undercover cop and threatened to kill him.  *Id.*  Plaintiff told Dr. Montgomery the drug dealer "hunt[ed]" him, which caused nightmares, paranoia, and feeling that he is being "followed to this day."  *Id.*  Plaintiff reported that the drug dealer incident affects his ability to work in a new environment.  *Id.*

### 2. Elizabeth Nickens, LCSW

Plaintiff engaged in on-and-off psychotherapy sessions with Elizabeth Nickens, LCSW, from November 2010 to June 2013, during which they discussed Plaintiff's history of childhood sexual abuse by his father and Plaintiff's efforts to abstain from substance use. AR 444-55.

### 3. Kaiser

Plaintiff engaged in treatment with providers from Kaiser Permanente primarily during the period spanning from May to July 2011. AR 471-656. Plaintiff initially visited Kaiser on July 24, 2008, and reported having trouble sleeping, thinking "about a lot of things" at night, and his history of drug use. AR 475-76. He did not return until May 23, 2011, at which time he reported taking Cymbalta to help him think clearly and that he was suffering from bilateral foot pain. AR 486.

On June 17, 2011, Plaintiff spoke to several providers over the phone to report that he felt his psychiatric medication was making his condition worse, that he was having trouble getting to sleep, that he was having a hard time focusing and staying on task, and that he was still having problems with anxiety and depression. AR 495-96. On June 20, 2011, Plaintiff called Kaiser to follow up on his previous call and again reported that his medication was making his anxiety and depression worse, that he was not sleeping well, and that he felt he was going to have a panic attack. AR 569-70.

On June 22, 2011, Plaintiff visited Kaiser for a psychiatrist intake evaluation with Xiu Ruo Lowe, M.D., during which he was tearful through the session, described his history of childhood molestation, reported smoking marijuana regularly, and reported the following symptoms: mood is all over the place; poor concentration; low energy; insomnia; changed appetite; excessive worry; racing thoughts; and restlessness. AR 578-82. Dr. Lowe diagnosed recurrent major depression, generalized anxiety disorder; panic disorder, and continued marijuana abuse. AR 582.

From July 18 to July 19, 2011, Plaintiff was admitted into the emergency department at Kaiser following a 5150 hold after he was found at Walgreens hearing voices and becoming agitated and paranoid. AR 514-16. During his admission, Plaintiff was diagnosed with psychotic disorder NOS, rule out drug-induced psychosis, and was observed to be disheveled, anxious,

4

paranoid and exhibited psychomotor agitation, tangential thought process, impaired concentration, and memory issues.  AR 528-30.

From July 19 to July 22, 2011, Plaintiff received inpatient treatment at Telecare Heritage Psychiatric Health Facility where he was placed on a psychiatric hold for being a danger to self; exhibiting tangential thought process, paranoid ideation, impaired concentration, and impaired judgment; was described as being anxious, nervous, and irritable to the point that he starts talking out of control; and was diagnosed with major depression with psychotic symptoms and drug dependence.  AR 340-44.

On July 27, 2011, Plaintiff met with a Kaiser Psychiatry social worker, Eve Marie Colello-Moltzen, LCSW, as part of a referral to the Intensive Outpatient Program.  AR 600-22.  Ms. Colello-Moltzen noted the following history: anxiety including excessive worry, restlessness, muscle tension, and hypervigilance; depression including depressed mood, anhedonia, crying spells, significant appetite change, insomnia, irritability, agitation, and decreased concentration; panic including shortness of breath, fear of dying, fear of losing control/going crazy, and shaking; sleep issues including difficulty falling asleep; substance abuse including alcohol and marijuana; and trauma including recurrent memories/thoughts, distressing dreams, flashbacks, hypervigilance, avoidance, and sexual trauma.  AR 600.  She noted that Plaintiff is "not self-medicating as heavily as before hospitalization and is therefore feeling emotions he has not been able to deal with in the past."  *Id.*  She also noted a positive toxicology screening for amphetamines from July 19, 2011.  AR 601.  In her mental status examination, Ms. Colello-Moltzen observed that Plaintiff exhibited psychomotor agitation, tearfulness, pressured speech, labile affect, and impaired concentration.  AR 600, 602.  She diagnosed Plaintiff with major depression, recurrent and assessed that Plaintiff is a polysubstance abuser and may be experiencing a possible mixed episode of bipolar disorder, but that she could not provide a complete assessment in the context of Plaintiff's marijuana use.  AR 602.

That same day, Plaintiff was also seen by Paula Xiaoping Lee, M.D.  AR 606-13.  Dr. Lee noted that Plaintiff's mood was "all over the place" and observed that he appeared depressed, anxious, and "emotional [sic] volatile" during his interview.  AR 607.  Dr. Lee observed Plaintiff's

5

speech was loud and pressured, his thought process was tangential and jumping from topic to topic, that he was restless and fidgety, and that he reported using marijuana that morning but denied other drug use. *Id.* Dr. Lee assessed that Plaintiff has a history of depression and anxiety complicated by his substance abuse; that a recent episode of psychosis apparently induced by substance abuse had abated but his mood continued to be depressed, anxious, and labile; and that Plaintiff has many symptoms suggesting bipolar disorder but that he would need to be reevaluated in the context of being clean and sober. AR 610.

Plaintiff missed his next two appointments at Kaiser Permanente, after which it appears he did not remain engaged in treatment with them. AR 642-56.

### 4.    John George Psychiatric Pavilion

From February 6, 2012 to February 10, 2012, Plaintiff received inpatient treatment at John George Psychiatric Pavilion where he was placed on a psychiatric hold for being a danger to self; exhibited labile affect, anxiety, tearfulness, paranoia, delusional thought, limited insight, and limited judgment; admitted to methamphetamine use; and was diagnosed with psychotic disorder and methamphetamine dependence. AR 414-23.

### 5.    Dr. Blank

On February 23, 2017, Plaintiff met with Jeremy Blank, Psy.D. for a psychological examination. AR 456-70. Dr. Blank conducted a clinical interview, reviewed unspecified records in a "Social Security Packet" related to Plaintiff's claim, and administered the Folstein Mini Mental Status Exam. AR 457-70. Plaintiff reported to Dr. Blank that he had a positive response to his medications and that he was compliant with his medications. AR 459.

Plaintiff's results from the Folstein exam indicated he was in the "intact range," that his results were not indicative of a formal neurocognitive disorder, that he was "moderately impaired" due to depression, anxiety, and possibly bipolar, that he was "mild to moderately impaired" functionally due to emotional concerns, and that his prognosis was "fair" with continued mental health services and medication compliance. AR 461. Dr. Blank diagnosed Plaintiff with unspecified depressive disorder, with history of psychotic features (none current) and unspecified anxiety disorder (rule out social anxiety disorder), and determined that he has a mildly limited

United States District Court
Northern District of California

ability to: maintain adequate attention/concentration; relate and interact appropriately with supervisors, coworkers, and the public on a regular basis; and adapt to day-to-day work activities. AR 461-62. Dr. Blank also assessed that Plaintiff has a mild to moderately limited ability to: adapt to changes in job routine; withstand the stress of a routine workday; and adapt to changes, hazards, or stressors in workplace setting. AR 462. Dr. Blank opined that Plaintiff had no impairment with his abilities to follow simple or complex/detailed instructions or to maintain adequate pace or persistence to perform one-to-two step simple repetitive tasks or complex tasks. AR 461.

### 6. Dr. Abraham

On February 6, 2017, Plaintiff underwent a psychological evaluation with Deepa Abraham, Ph.D. AR 665-78. Dr. Abraham observed Plaintiff was well-dressed and behaved in a socially acceptable and polite manner, although he raised his voice at one point. AR 669-70, 676. She observed Plaintiff spoke in an articulate manner and demonstrated good abstract reasoning skills, he had normal thought content and no cognitive impairment, and his attention/concentration remained consistent throughout the assessment. AR 670, 676.

Dr. Abraham conducted a clinical interview, administered several tests (including the Wechsler Adult Intelligence Scale, Fourth Edition; Wechsler Memory Scale, Fourth Edition; Trails A and B), and reviewed treatment records from Dr. Montgomery spanning from November 11, 2010 to September 23, 2016. AR 665. Dr. Abraham noted that Plaintiff presented symptoms consistent with mood disorder and that he reported experiencing melancholic mood, irritability, heightened anxiety, social withdrawal, fatigue, reduced appetite, and poor hygiene. AR 666. Dr. Abraham documented a narrative history of Plaintiff's background and psychiatric history which including a history of multiple traumatic head injuries, trying to self-medicate to address his mental health impairments, a history of childhood sexual abuse from his father, his history of substance abuse and subsequent sobriety since engaging in a medication and therapy regimen with Dr. Montgomery, his history of psychiatric hospitalizations, his job history and difficulty maintaining work due to his mental health symptoms, and his relationship history. AR 666-69. Plaintiff "spoke highly" of his treatment and medications, stating that he did not crave drugs

anymore and the medication took away the addictive feelings. AR 667. He also reported experiencing "beneficial results" associated with his psychotropic and therapeutic regimen. AR 671.

On the Weschler Adult Intelligence Scale, Plaintiff scored in the "average" range in numerous subtests, with one "above average" score. AR 672. Dr. Abraham noted he performed "well" on other subtests. *Id.* Dr. Abraham also noted Plaintiff "exhibit[ed] good immediate rote recall skills and a capacity for concentration and attention." *Id.* Dr. Abraham found Plaintiff "exhibit[ed] average language development, logical abstract reasoning, verbal concept formation, word knowledge, and a decent range of general factual knowledge." *Id.*

On the Wechsler Memory Scale, Plaintiff struggled across all domains. AR 673-74. Dr. Abraham noted that he quit items prematurely and appeared to exert very little effort in completing tasks with accuracy, to which she added that Plaintiff's poor performance may be attributed to decreased motivation, lack of effort, and possibly fatigue. AR 673-74. Dr. Abraham also noted that Plaintiff's low scores were inconsistent with his clinical history and behavior observations and were unexpected given his performance on other testing. AR 674. On trail making tests, Dr. Abraham stated that Plaintiff's task performance suggested that the history of several instances of head trauma have had no apparent sequelae. *Id.*

Dr. Abraham diagnosed Plaintiff with polysubstance dependence and personality disorder, not otherwise specified. AR 675. Dr. Abraham elaborated that Plaintiff would "experience difficulty competing for jobs in an open labor market because of maladaptive personality traits" indicated by his diagnosis of personality disorder. AR 677. In the area of mental abilities needed to attend, sustain effort, comprehend, or remember, Dr. Abraham rated Plaintiff as "moderately impaired." *Id.* In the area of social interaction, Dr. Abraham rated Plaintiff as "markedly impaired" in light of his history of clashing with others and his socially isolated lifestyle. *Id.* In the area of adaptation, Dr. Abraham rated Plaintiff as "markedly impaired" and elaborated that he would have difficulty with the following: coping with daily or usual stresses encountered in a competitive work environment, adapting to changes in tasks or responsibilities because of conflictual interpersonal relationships; and managing his anger. *Id.* Dr. Abraham stated that

8

Plaintiff's "demeanor is dramatic and he appears to exaggerate his symptoms in order to garner attention and sympathy from others."  AR 675.

### 7.    Dr. Solomon

Patrice Solomon, Ph.D., reviewed medical records in Plaintiff's case file at the initial level of his disability application on October 13, 2015.  AR 104-11.  Dr. Solomon opined Plaintiff had no more than mild limitations in his daily activities, concentration-related abilities, and social functioning.  AR 109.  In reaching this opinion, Dr. Solomon relied in part on Dr. Montgomery's largely normal mental status findings (although noting "fair" concentration, insight, and judgment).  *Id.*  Dr. Solomon also relied on Plaintiff's past work requiring technical skills, which she found illustrated adequate concentration, and that he could perform his daily activities independently.  *Id.*

### 8.    Dr. DeCubas

Mercedes DeCubas, Ph.D., reviewed medical records in Plaintiff's case file at the reconsideration level of his application on February 15, 2016.  AR 113-24.  Dr. DeCubas opined that Plaintiff could understand instructions, carry them out "moderately well," and was able to follow a schedule.  AR 119.

### III.    SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On July 31, 2015, Plaintiff filed a claim for Social Security Disability Insurance benefits, alleging disability beginning on July 21, 2015.  AR 186.  On October 14, 2015, the Social Security Administration ("SSA") denied Plaintiff's claim, finding he did not qualify for disability benefits.  AR 127.  Plaintiff subsequently filed a request for reconsideration, which was denied on February 18, 2016.  AR Nos. 131-32.  On April 6, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 138.  ALJ Arthur Zeidman conducted a hearing on March 30, 2017.  AR 34-103.  Plaintiff testified in person at the hearing and was represented by counsel, Morgan McGinnis.  The ALJ also heard testimony from Vocational Expert Susan Miranda and Plaintiff's sister, Jennifer Plaintiff.

### A.    Plaintiff's Testimony

Plaintiff testified that he relies on public transportation and rides from family members to

get around; that he completed the eleventh grade in school; and that he received on-the-job training as an electrician and specialist machinist. AR 40-41.

The ALJ asked Plaintiff about his work history and reviewed each job listed in the administrative record. AR 41-64. Plaintiff testified he worked for Rick Martinez in 2002 as a lead hood steam cleaning technician for casinos and restaurants, which involved cleaning commercial kitchen hoods with a hot seat pressure washer, working with a helper, wheeling around equipment up to 200 pounds, engaging in overhead reaching, and wearing a chemical suit and respirator for protection. AR 42-45. He testified that the job ended because his "body couldn't take it anymore." AR 42-43, 45.

Plaintiff next worked for Speedy Mailing Services in 2002 as a worker that would place inserts into newspapers. AR 45-46. He also worked for Fire Extinguisher Service Center in 2002 to 2003 doing similar work as he did for Rick Martinez, cleaning kitchen hoods, with the primary difference being that he was required to have a fire marshal certification. AR 47.

Plaintiff testified that he worked for Vintage Class Motor Cars in 2004 as a salesman for restored vintage cars. AR 48-51. He provided background on how he was able to work in the role of selling restored vintage cars, including testifying about previous work making aviation maintenance equipment, selling cars, and selling maintenance publications for aircraft. AR 48-49. Plaintiff testified that he did not stay at the job with Vintage Class Motor Cars because he had a conflict with the owner and that a lot of his jobs have ended in "not being able to control my emotions." AR 50. He testified that when he gets "in any kind of confrontational situation," it "gets way out of hand," but medication keeps him "from feeling like that on a day-to-day basis." *Id.*

After Vintage Class Motor Cars, Plaintiff worked as an electrical contractor in various short-term positions with Edgmon Electric, Garry Goodnow, and Brian McFadden. AR 51-52. He testified that he did not remember the nature or circumstances of his work with Odyssey Business Services from 2005 to 2006. AR 52-53. Plaintiff testified about his tendency to end jobs due to interpersonal conflicts, stating that he "will walk away from something before [getting] into a violent confrontation about something" and that he can be "provoked easily into being a violent

person" and hates that about himself.  AR 53.

Plaintiff testified that his work with Stanley Dulles Wickware and Kevin Garrett in 2006 to 2007 were continuations of his work as an electrical contractor.  AR 53.  He testified that he was also self-employed in 2007 doing satellite installation work as a contractor for Dish Network.  AR 53-54.  He described it as challenging working with a lot of customers whose "lifestyles are so different" with several appointments per day and that he stopped doing the work because he was in a very unhappy place with his marriage at the time and he "started to self-medicated [sic]."  AR 54-55.  Plaintiff elaborated that he then moved back home to be taken care of by his parents and give himself time to get back on his feet.  AR 56.

Plaintiff testified that in 2008 he tried to work for another Dish Network contractor, RFG Corporation, and that it "just didn't work out."  AR 56-57.  Afterward, he worked with Advanced.com in 2009 but could not recall what kind of work he did there.  AR 57.  Plaintiff also testified he could not recall the work he did for HDMC Group in 2009 to 2010 but speculated that it must have been another Dish Network contractor.  *Id.*

Plaintiff testified that he worked for Waste Management of Alameda County from 2010 to 2011.  AR 57-58.  He testified that he was brought on permanently by Waste Management as a facility manager after working in a temporary position, that it was initially a good fit because his work history was relevant to the facilities maintenance responsibilities that were given to him, but that the job became too overwhelming after Waste Management put him in charge of the entire lead certification for his facility on top of the usual job duties.  AR 58-60.

Plaintiff testified that he was out of work for a while until finding temporary work through Venture HR in 2013 as an "order selector" for a distributor of Kelly-Moore Paints, which he described as a warehouse job driving a cherry picker and pulling orders and bringing them to shipping.  AR 60-61.  He testified that he could not find work in 2014 and then found temporary work in 2015 through Continental Design, a subcontractor for Tesla Motors, and that his work involved gluing door seals in a warehouse.  AR 61-63.  Plaintiff elaborated that he worked in a majority female employee environment and that he felt that his female coworkers "basically ran [him] out" of the job because they were jealous of his high performance and that everything got

"really bad quick." AR 62-63. Plaintiff testified that after the temp job, he "kind of went off the rails" and has not worked since. AR 63-64.

The ALJ next asked Plaintiff about his medical history and treatment. AR 64-79. Plaintiff testified to his history of head injuries, including the incident in sixth grade when he ran forehead-first into a tether ball pole, concussions from playing football, and a head-on collision with the steering wheel while driving which "split [his] head open." AR 65-66. Plaintiff elaborated that after his last injury to his head, life began to feel like more of a "struggle" than before and he experienced great difficulty with his anger issues and social anxiety. AR 66.

The ALJ asked Plaintiff to explain his described "self-medication." AR 68. Plaintiff testified that he was in a bad marriage at the time and that he was trying to implement the practice of walking away from confrontational situations but that he would then drink and use drugs to try not to feel the bad feelings he was experiencing. AR 68-69. When asked what changed for him to become clean and sober, Plaintiff answered that around 2012 he had serious conversations with his doctor about the possibility that his behavior might lead to his death, which served as motivation to change. AR 69-70.

The ALJ then asked Plaintiff to explain more recent reports of continuing to drink alcohol on social occasions and using marijuana at least twice per week. AR 70. Plaintiff denied using marijuana at least twice per week and explained that he does not seek to purchase marijuana for himself but will use it on occasion when someone he knows offers him some. AR 71. Regarding alcohol consumption, Plaintiff answered that when he is in a social environment with family and knows he will not over drink, he will have a drink or two before dinner. AR 70-71. He testified that his medications fill his needs so he does not need to take drugs. AR 71.

The ALJ asked Plaintiff to explain why he has not been able to work even though it appears he has been receiving good medical treatment and has been able to stay away from drug use. AR 71-72. Plaintiff responded that he is unable to work because of his extreme social anxiety. AR 72. When he took his medication, he did "not feel horrible," but it did not make him feel "great." *Id.* He elaborated that he is very withdrawn, especially around strangers, and suffers panic attacks in public. AR 72-73. Plaintiff further elaborated that the medication he takes helps

1   with his "day-to-day living," but it does not make him okay enough "to just go start work again

2   because [he is] on [his] pills" and that he feels "[e]verything is still the same," but that his

3   medication "keeps [him] from getting out of hand . . . to where people think you're crazy."  AR

4   73.  Plaintiff testified that his medication side effects cloud his ability to focus and that he will

5   often repeat a task because of not remembering whether he did it or not.  AR 74.

6       Plaintiff testified that he likes to paint as a way to keep calm and to occupy his free time.

7   AR 74-75.

8       The ALJ asked Plaintiff about where he sees himself going in his future.  AR 76-77.

9   Plaintiff responded that he has been approached about selling his artwork, but he refused to sign

10  with any of the representatives because of what they demanded in return.  AR 77.  He stated that

11  the "biggest thing" for him is that he hates having to rely on other people for "normal day-to-day"

12  things and that it if he can in the future, he would like to get back to working again in some

13  fashion.  AR 77-78.  Plaintiff testified that he wishes he could get through "all of those days

14  without having a violent confrontation ever again and without ever spending another day in

15  custody because of the violence and to be self-sufficient again."  AR 79.

16      Next, Plaintiff's representative questioned him about side effects from his medication.  *Id.*

17  Plaintiff explained that it affects his motor skills and demeanor and that, although it helps a lot

18  with his worrying, it also impairs him in ways such as feeling unable to "walk 100 percent

19  straight."  AR 79-80.  He stated that when he takes Klonopin, "It puts me in a place where I can be

20  around people that I don't know."  AR 80.  He also testified he has trouble remembering to take

21  his medications but that his girlfriend helps him with his pills and that she has "kind of turned in to

22  my nurse."  *Id.*  Plaintiff testified that he sees his doctor, Dr. Montgomery, once a month to check

23  on the side effects of his medication.  AR 80-81.

24      Upon being asked by his representative to describe a typical day, Plaintiff testified that

25  waking up early is difficult and that he typically wakes up anywhere from 8:00 a.m. to 10 a.m.;

26  that he wakes up groggy; that he watches television and cleans up around the house where he can,

27  but that he is "not good at it"; that there are a couple of neighbors he can interact with without

28  having to feel weird; and that he waits for his girlfriend to get home from work to spend the

13

evening together. AR 81-82. He testified that on some days, he paints during the day but that this is limited to when he can obtain the paint supplies, usually from having someone else purchase them for him. AR 82. Plaintiff testified that he will go days without leaving the house and if he does, it is only to go to the corner store or right up the street. *Id.*

Upon being asked by his representative to elaborate on mental health symptoms other than social anxiety, Plaintiff testified that he has lost interest in things he used to enjoy, like golf and athletics; that anxiety prevents him from being able to leave the house often; that he experiences frequent mood swings, particularly with getting angry; that he experiences flashbacks of the abuse he experienced as a child; and that he has trouble trusting people, including his own lawyer and representative in his pending Social Security disability claim. AR 83-86.

**B. Vocational Expert's Testimony**

The ALJ then took testimony from the vocational expert, who categorized Plaintiff's past work as Order Picker, DOT[2] code 922.687-058, medium exertion, unskilled, Specific Vocational Preparation[3] ("SVP") 2; Manager, Solid Waste, DOT code 184.167-078, light exertion, skilled, SVP 7; Technician, Plant Maintenance, DOT code 822.281-030, medium exertion, skilled, SVP 7; Auto Assembler, DOT code 806.684-010, medium exertion, unskilled, SVP 2; Electrician, DOT code 824.681-010, light exertion, semi-skilled, SVP 4; Auto Salesperson, DOT code 273.353-010, light exertion, skilled, SVP 6; Fire Repairer, DOT code 709.384-010, medium exertion (heavy as performed), semi-skilled, SVP 3; Industrial Cleaner, DOT code 389.664-010, heavy exertion, semi-skilled, SVP 3; and Paper Inserter, DOT 794.687-058, light exertion, unskilled, SVP 1. AR 87-92.

---

[2] The Dictionary of Occupational Titles by the United States Department of Labor, Employment & Training Administration, may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d) (1). The "best source for how a job is generally performed is usually the Dictionary of Occupational Titles." *Pinto v. Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).
[3] "The Dictionary of Occupational Titles lists an SVP time for each described occupation. Using the skill level definitions in 20 C.F.R §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." Social Security Ruling 00-4p.

The ALJ asked the VE two hypothetical questions.  In the first, the ALJ asked the vocational expert whether an individual of Plaintiff's education and work background would be able to perform his past work if the individual's only limitation was frequently responding appropriately to supervisors, coworkers, and the public.  AR 92.  The vocational expert responded that such an individual would be able to perform all of Plaintiff's past jobs.  *Id.*

In the second hypothetical, the ALJ included the following non-exertional limitations:

> can never work at unprotected heights; can only work with moving mechanical parts occasionally; can never operate a motor vehicle.  In understanding, remembering, and carrying out instructions, has difficulty in focusing on work and remembering and following instructions due to effects of medication; responding to supervisors, coworkers, and the public only occasionally, dealing with changes in work setting limited to simple work-related decisions.

AR 93.  The vocational expert responded that the individual described in the second hypothetical would not be able to perform any work.  *Id.*  The expert elaborated that only being able to occasionally respond to supervisor would preclude employment in the competitive labor market and that one must be able to respond appropriately to supervisors on demand and sometimes quite often frequently.  AR 93-94.

Upon questioning from Plaintiff's representative, the vocational expert testified that no jobs in the national economy would be available for anyone who missed at least two days of work per month.  AR 94.

## C. Jennifer Plaintiff's Testimony

The ALJ then allowed lay witness testimony from Plaintiff's sister, Jennifer G.  AR 95-99.  When asked by Plaintiff's representative about what keeps Plaintiff from working, she testified that his mental illness causes challenges in being around other people and that he will "be a complete mess" and stressed out while running just simple errands.  AR 96.  Jennifer offered the example that anytime there is a change to the usual Sunday family dinner routine such as another person being invited, the stress is "just maxed out."  AR 96-97.  Jennifer elaborated further and testified that Plaintiff becomes "a little all over the place with his thoughts" and that he is challenged by the simple things such as taking a shower to get ready or brushing his teeth.  AR 97.  She testified that it is also a challenge when Plaintiff talks about his theories on aliens, time travel,

and chips in people's heads. *Id.*

When asked by the ALJ if Plaintiff's condition was worse years ago prior to getting on medication, Jennifer testified that it was and that they had to "put up some real significant criteria" for him to be allowed into the home, that there were times that she hid in her room to call the police on him, although this level of concern last presented itself about six years before the time of the hearing. AR 99.

**D.     ALJ's Decision and Plaintiff's Appeal**

On September 5, 2017, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. AR 16-28. This decision became final when the Appeals Council declined to review it on July 9, 2018. AR 1. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). On January 11, 2019, Plaintiff filed the present Motion for Summary Judgment. On January 7, 2019, Defendant filed a Cross-Motion for Summary Judgment.

## IV.     STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports

the ALJ's decision.  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'"  *Id.* (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).  A court may not reverse an ALJ's decision because of an error that is harmless.  *Id.* at 1111 (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## V.   DISCUSSION

### A.   Framework for Determining Whether a Claimant Is Disabled

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[4]  20 C.F.R. § 404.1520.  The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ determined Plaintiff had not performed substantial gainful activity since July 21, 2015.  AR 21.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act.  20

---

[4] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined Plaintiff had the following severe impairments: affective disorders and anxiety disorder. AR 21.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets the listings. AR 22.

Before proceeding to step four, the ALJ must determine the claimant's Residual Function Capacity ("RFC"). 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined Plaintiff has the RFC to perform "a full range of work at all exertional levels," but with the following nonexertional limitations: "the claimant is limited to frequent contact with supervisors, coworkers, and the general public." AR 23.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined Plaintiff could perform past relevant work as an Order Taker and Installation Technician (plant maintenance). AR 27.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, the ALJ did not proceed to the fifth step because he determined Plaintiff could perform past relevant work.

**B.      Plaintiff's Arguments**

Plaintiff raises five arguments in support of his motion: (1) the ALJ erred in failing to give proper weight to the medical evidence; (2) the ALJ erred in failing to find post-traumatic stress disorder a severe impairment at Step Two; (3) the ALJ erred in determining Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not consistent with the medical evidence; (4) the ALJ erred in determining that Plaintiff does not meet Listings 12.04, 12.06, and/or 12.15 at Step Three; and (5) the ALJ's assessment of Plaintiff's RFC is not based on substantial evidence and fails to include all limitations.

**C.      Medical Evidence[5]**

Plaintiff argues the ALJ erred in giving Dr. Montgomery's and Dr. Abraham's opinions "little weight," and instead relying on the opinions of the State agency medical consultants, Drs. Solomon and DeCubas. Pl.'s Mot. at 4-10. The Court shall consider each opinion in turn.

**1.      Legal Standard**

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *King v. Berryhill*, 2018 WL 4586726, at *11 (N.D. Cal. Sept. 25, 2018). In deciding how much weight to give to any medical opinion, the ALJ considers the extent to which the medical source presents relevant evidence to support the opinion. 20 C.F.R. § 416.927(c)(3). Generally, more weight will

---

[5] Rules regarding the evaluation of medical opinion evidence were recently updated, but the updates were made effective only for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844 (Jan. 18, 2017). As Plaintiff's claim was filed on July 31, 2015, the Court evaluates the medical opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p.

be given to an opinion that is supported by medical signs and laboratory findings, and the degree to which the opinion provides supporting explanations and is consistent with the record as a whole. 20 C.F.R. § 416.927(c)(3)-(4).

In conjunction with the relevant regulations, the Ninth Circuit "developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "By rule, the Social Security Administration [SSA] favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the [Social Security] Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See id.* at 632 (citing SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)).[6] "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p at *4.

### 2.    Dr. Montgomery

#### a.    ALJ's Opinion

There is no dispute that Dr. Montgomery is Plaintiff's treating physician. Pl.'s Mot. at 4; Def.'s Mot. at 3. In his opinion, the ALJ summarized Dr. Montgomery's March 31, 2016 mental health report, in which he opined that Plaintiff had marked limitations in his abilities to maintain attention for extended periods of time, work in coordination with/proximity to others without being distracted, get along with coworkers, complete a normal workday/workweek, or respond appropriately to changes in a routine work setting. AR 26 (citing AR 401-02). The ALJ also summarized Dr. Montgomery's February 24, 2017 Mental Impairment Questionnaire in which he opined Plaintiff had marked limitations in his overall ability to understand, remember, and apply information, as well as marked limitations in: interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. *Id.* (citing AR 466-70). The ALJ gave this opinion "little weight . . . because it is inconsistent with his treatment notes that document moderate and/or mild anxiety and depression." *Id.* He noted that "Dr. Montgomery's objective mental status examinations consistently documented appropriate affect, logical thought process, no hallucination, and good memory," and that "[e]ven though [Plaintiff] exhibited impaired concentration and attention, the most recent consultative evaluation's IQ and other intellectual functioning scores indicate the impairment is not more than mild." *Id.* (citing AR 657-64; 680). The ALJ also noted that Plaintiff's sessions with Dr. Montgomery "were routine in nature,

---

[6] "[Social Security Rulings] do not carry the force of law, but they are binding on ALJs nonetheless." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1). The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations." *Chavez v. Dep't of Health and Human Serv.*, 103 F.3d 849, 851 (9th Cir. 1996).

consisting of follow-ups and medication refills."  AR 25.

### b. Parties' Positions

Plaintiff argues the length and nature of his treating relationship with Dr. Montgomery sufficiently show that his assessment is supported by the available objective evidence.  Pl.'s Mot. at 5.  He notes he began receiving care from Dr. Montgomery in November 2010 and it has continued on a near monthly basis since February 2012.  *Id.* (citing AR 380-413, 466-70, 657-64, 679-80).  Plaintiff also argues that stable findings in a mental status examination "do not necessarily preclude disabling impairments as they do not necessarily mean 'better' or 'asymptomatic.'"  *Id.*  He maintains the ALJ erred "in not recognizing the differing purposes of Dr. Montgomery's treatment notes and the mental impairment questionnaire," because "[t]he treatment notes are brief, while the mental impairment questionnaire[] is detailed."  *Id.* at 7.  He contends the "records do not contradict the forms; they just do not provide the same level of detail. This was not a legitimate reason to discount Dr. Montgomery's opinion."  *Id.*

In response, Defendant notes the ALJ "gave numerous reasons" for giving Dr. Montgomery's opinion little weight, and these reasons "serve as proper bases for discounting Dr. Montgomery's extreme opinion."  Def.'s Mot. at 4.

### c. Analysis

Here, the ALJ recognized the limitations Dr. Montgomery opined in his March 31, 2016 mental health report and February 24, 2017 Mental Impairment Questionnaire, but then provided specific reasons for giving his opinion little weight.  First, the ALJ explained that the limitations were "inconsistent with his treatment notes that document moderate and/or mild anxiety and depression," including "Dr. Montgomery's objective mental status examinations consistently document[ing] appropriate affect, logical thought process, no hallucination, and good memory."  AR 26 (citing AR 659-64).  Second, the ALJ noted that "the most recent consultative evaluation's IQ and other intellectual functioning scores" indicated he had no more than mild impairment in concentration and attention.  *Id.*  In addition, the ALJ considered how Dr. Montgomery's opinion contrasted with the "routine" nature of Plaintiff's treatment, which "consist[ed] of follow-ups and medication refills."  AR 25. These reasons serve as proper bases for discounting Dr.

Montgomery's opinion. *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion properly rejected when treatment notes "provide no basis for the functional restrictions he opined should be imposed on [claimant]"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("an ALJ need not accept a treating physician's opinion that is conclusory and brief and unsupported by clinical findings"); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ provided adequate reasons for not fully crediting the treating doctor's opinion that the claimant "was disabled" by pointing out that clinical findings described the claimant as a "[w]ell developed, well nourished middle aged female in no acute distress"); *Johnson v. Shalala*, 60 F.3d 1428, 1433 (9th Cir. 1995) (doctor's opinion may be discounted or rejected if it is self-contradictory); *Matney*, 981 F.2d at 1020 (internal inconsistencies and ambiguities within doctor's opinion provided specific and legitimate reasons for ALJ to reject opinion); *Valentine*, 574 F.3d at 692-93 (contradiction between treating physician's opinion and his treatment notes constitutes a specific and legitimate reason for rejecting treating physician's opinion); *Tommasetti*, 533 F.3d at 1041 (incongruity between medical records and opinion provided a specific and legitimate reason for rejecting treating physician's opinion); *Rollins*, 261 F.3d at 856 (ALJ permissibly rejected treating physician's opinion when opinion was contradicted by or inconsistent with treatment reports).

Plaintiff appears to argue that deferential weight should have been assigned to Dr. Montgomery's opinion based on the length of the treatment relationship and the frequency of appointments. Pl.'s Mot. at 4-5. However, frequency of examination is just one relevant consideration. *See* 20 C.F.R. § 404.1527(c) (listing factors in deciding the weight we give to any medical opinion). It does not override other considerations, such as whether the physician supports the opinion with relevant evidence, "particularly medical signs and laboratory findings," or whether the opinion is consistent with the record as a whole. *Id.*; *see Matney*, 981 F.2d at 1019 (an "ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusionary and brief and is unsupported by clinical findings").

Further, the ALJ referenced unremarkable mental status examinations as a reason for discounting Dr. Montgomery's opinion, and Plaintiff does not challenge the ALJ's conclusion that

23

1    Dr. Montgomery's objective findings were generally mild in nature.  Instead, Plaintiff argues that

2    other "objective evidence" exists to support the opinion, namely his symptoms reported to Dr.

3    Montgomery at appointments.  Pl.'s Mot. at 5.  However, complaints of symptoms are not

4    objective medical evidence by virtue of being reported to a physician.  *See* 20 C.F.R. §

5    404.1529(c)(2) ("Objective medical evidence is evidence . . . of medically acceptable clinical and

6    laboratory diagnostic techniques"); 20 C.F.R. § 404.1528 (distinguishing between self-reported

7    symptoms and medical signs and laboratory findings); *Batson*, 359 F.3d at 1195 n.3 (treatment

8    notes containing limitations based on claimant's subjective descriptions are "not . . . objective

9    medical evidence of limitations asserted in [the doctor's] report").  Nor can Dr. Montgomery's

10   diagnosis of bipolar disorder alone establish the extreme nature of the opined limitations.

11   *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is

12   insufficient proof of a disability.").  In looking at the objective findings from mental status

13   examinations, the ALJ correctly noted that Dr. Montgomery consistently observed Plaintiff to

14   have appropriate affect,[7] logical thought process, no hallucinations, and good memory.  AR 26,

15   392-400, 404-13, 659-64.  Dr. Montgomery also noted throughout these examinations that

16   Plaintiff had normal appearance, cooperative behavior, normal speech, intact associations, good

17   "fund of knowledge," euthymic mood (at times), and he was oriented to person, place, and time.

18   *Id.*

19         Moreover, the results of intellectual functioning tests by Dr. Blank indicated that Plaintiff's

20   cognitive abilities were intact, he had no difficulties following simple or complex directions, and

21   his intellectual functioning was in the "low normal range."  AR 461-62; *see also* AR 25

22   (discussing Dr. Blank's examination findings).  Dr. Abraham found Plaintiff's full scale IQ score

23   fell in the "average range" and noted he "exhibit[ed] good immediate rote recall skills and a

24   capacity for concentration and attention."  AR 672.  In addition, Plaintiff "exhibit[ed] average

25   language development, logical abstract reasoning, verbal concept formation, word knowledge, and

26   a decent range of general factual knowledge."  *Id.*  The ALJ properly noted and relied upon these

27

28   ───────────────
     [7] Dr. Montgomery noted Plaintiff had "flat affect" in some earlier treatment notes, but consistently
     found "appropriate affect" in mental status examinations after March 2016.  AR 404-13, 659-64.

inconsistencies in discounting Dr. Montgomery's opinion.

Finally, Plaintiff fails to adequately address the ALJ's other reasons for assigning Dr. Montgomery's opinion little weight. As to the ALJ's finding that Dr. Montgomery's treatment was "routine in nature, consisting of follow-ups and medication refills," Plaintiff summarily states that this is not a legitimate reason for discounting the doctor's opinion. Pl.'s Mot. at 5. However, treatment consisting of routine check-ups and medication refills is a relevant consideration. *Johnson*, 60 F.3d at 1434 (conservative treatment "suggest[s] a lower level of both pain and functional limitation"). Dr. Montgomery kept Plaintiff on the same regimen (Klonopin, Zoloft, and Abilify) since October 2014 and the same doses since September 2015. AR 384, 392-400, 404-13, 659-64. In addition, Plaintiff himself frequently reported improvement with his medication regimen. AR 392-95, 407-09, 459, 662-63, 667, 671 ("improved depression" and mood; "positive" response to medications; "reported experiencing beneficial results"; "spoke highly" of his medications). He also testified that his medications help on a day-to-day basis. AR 50, 73. "Impairments that can be controlled effectively with medication are not disabling." *Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006)).

As to the ALJ's second reason for discounting Dr. Montgomery's opinion, namely that his "IQ and other intellectual functioning scores" indicated that any impaired concentration and attention "[was] no more than mild," AR 26, Plaintiff fails to address it entirely in his motion and cannot raise a challenge for the first time in his reply. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("an argument raised for the first time in a reply brief . . . is not an argument that we may consider here"). Thus, he has waived any challenge to this reason by failing to address it in his motion. *See Ruiz v. Comm'r of Soc. Sec.*, 490 Fed. App'x 907, 908 (9th Cir. 2012) (where claimant challenged only one of five reasons the ALJ gave for rejecting an examining physician's opinion, "[claimant] concedes the first four findings by not addressing them before the court").

### d.     Conclusion

While Plaintiff may disagree with the ALJ's findings, the Court finds the record as a whole provides substantial evidence supporting the ALJ's decision to give Dr. Montgomery's opinion little weight. Further, even "where the evidence is susceptible to more than one rational

interpretation," the Court must uphold the ALJ's decision. *Magallanes*, 881 F.2d at 750 (citing *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984); *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)). It is the ALJ, not the Court, that must resolve determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities. *Batson*, 359 F.3d at 1196. Accordingly, the Court finds the ALJ did not commit reversible error and the decision must be affirmed.

### 3. Dr. Abraham

#### a. ALJ's Opinion

Dr. Abraham is an examining physician. Pl.'s Mot. at 7; Def.'s Mot. at 7. The ALJ noted that Dr. Abraham opined that Plaintiff "has a history of deterioration in occupational functioning, an inability to sustain work and severe interpersonal skills. He is moderately impaired in his ability to attend, sustain effort, comprehend and remember. He is markedly impaired in his social functioning, and adaptation. [She] assigned [Plaintiff] a Global Assessment of Functioning score indicating extreme limitations in social and occupational functioning." AR 27 (citing AR 665-78). However, the ALJ gave "little weight" to Dr. Abraham's opinion, in part based on the same reasons he identified in discounting Dr. Montgomery's opinion. AR 27. The ALJ further explained that he gave reduced weight to Dr. Abraham's opinion because she "attribute[d] some of the marked functional limitations to [Plaintiff's] substance abuse, which is not supported by the treatment records dated after the alleged onset date and contradicted by Dr. Montgomery's letter." *Id.* (citing AR 680).

#### b. Parties' Positions

Plaintiff argues that "the same reasons showing that the ALJ's rejection of Dr. Montgomery's opinion was erroneous . . . also apply here" because "it is right to take Dr. Montgomery's progress notes and opinion evidence as a whole rather than inconsistent parts and it was thus appropriate for Dr. Abraham to assess certain marked limitations consistent with the findings of Dr. Montgomery." Pl.'s Mot. at 8. Plaintiff further argues: "While it is true that Dr. Abraham's assessed limitations were informed by Mr. Plaintiff's substance use history, Dr. Abraham also clearly referenced other factors that are consistent with Mr. Plaintiff's present and

ongoing symptoms." *Id.* For example, Plaintiff notes that in finding he is markedly impaired in social interaction, Dr. Abraham pointed to his defiance of authority, inability to interact appropriately with peers or superiors, socially isolated lifestyle, and his poor sense of boundaries—all symptoms and behaviors that have remained ongoing since he stopped abusing substances. *Id.* (citing AR 50, 53, 194-213, 242, 380-413, 466-70, 657-64, 677, 679-80). He notes that Dr. Abraham also referenced specific incidents or events that occurred since he ceased abusing substances such as having a verbal altercation at his last job or raising his voice inappropriately during the examination. *Id.* (citing AR 677). Plaintiff maintains that the ALJ selectively highlighted Dr. Abraham's mention of contemplating his substance use history in reaching her conclusions while ignoring all the other history and information she also contemplated based on her clinical interview and review of his records. *Id.*

In response, Defendant argues the ALJ's reasons for discounting Dr. Abraham's opinion are legitimate because she failed to support her opinion with relevant evidence such as medical signs and laboratory findings. Def.'s Mot. at 8. Defendant argues that Dr. Abraham attributed Plaintiff's limitations to substance abuse, but this is not supported by the treatment records dated after the alleged disability onset date and are contradicted by Dr. Montgomery's letter stating that Plaintiff only occasionally uses marijuana and that it has no material effect on his mental conditions. *Id.* (citing AR 680). Defendant further argues the Court "should reject [Plaintiff's] attempt to downplay the effect that Dr. Abraham's perception of [his] drug use had on her ultimate opinion," as it is a specific and legitimate reason for discounting the opinion. *Id.* Defendant notes Dr. Abraham "clearly opined [Plaintiff] would have difficulty coping with work stress because drugs served as his coping mechanism and such use amplified his symptoms; and she explicitly referenced his hospitalizations in opining on his current functional abilities, even though his last hospitalization occurred three and a half years prior to his alleged onset date and he had no such episodes thereafter." *Id.* (citing AR 667–68).

### c. Analysis

In evaluating the opinion of an examining source, an ALJ considers the same factors under 20 C.F.R. § 404.1527(c) as when evaluating a treating physician's opinion, including whether

there is evidence supporting the opinion, whether it is consistent with the record as a whole, and any other factors relevant to weighing the opinion. Here, as he did with Dr. Montgomery, the ALJ recognized the limitations Dr. Abraham opined, but then provided specific reasons for giving her opinion little weight. AR 27.

While Dr. Abraham found no evidence to support the presence of malingering, she also stated "[Plaintiff's] demeanor is dramatic and he appears to exaggerate his symptoms in order to garner attention and sympathy from others." AR 670, 675. She stated that many of Plaintiff's reported mood symptoms, such as hostility, heightened anxiety, and social withdrawal "could reflect the continuous use of substances" and that his symptoms "tend to be amplified by the use of drugs and alcohol." AR 675, 677. Dr. Abraham concluded that Plaintiff copes with stress by using illicit drugs and alcohol, which interferes with his ability to function in society and makes it difficult for him to adapt to stress in a work environment, and therefore opined he had marked impairment in adaptation. AR 677. Indeed, Dr. Abraham drew a connection between Plaintiff's reported mood complaints and difficulty functioning in society to his drug use. AR 675, 677. Specifically, she wrote that he copes with stress by using drugs/alcohol and his "symptoms tend to be amplified by the use of drugs and alcohol. Hence, he will have difficulty coping with daily or the usual stresses encountered in a competitive work environment." AR 677. She also considered his drug-related hospitalizations from 2011 and 2012 in forming her opinion about his current functional abilities. AR 667, 677. Dr. Abraham's opinion that Plaintiff had marked impairment in adaptation appears based on her impression that he still abused drugs. *See* AR 675 ("In fact, many of the mood symptoms he complained of experiencing including hostility, poor hygiene, heightened anxiety, and social withdrawal could reflect the continuous use of substances."). However, the treatment records dated after the alleged disability onset date do not support this opinion. As the ALJ noted, Dr. Montgomery assessed that Plaintiff only occasionally used marijuana and that such use "does not have a material effect on his mental conditions." AR 27; 680. The regulations are explicit that more weight is given to opinion evidence that is supported by relevant evidence, particularly medical signs and laboratory findings. 20 C.F.R. §§ 404.1527(c)(3), 404.1528; *Thomas*, 278 F.3d at 957 ("The ALJ need not accept the opinion of any

United States District Court
Northern District of California

1   physician, including a treating physician, if that opinion is brief, conclusory, and inadequately

2   supported by clinical findings."); *Tonapetyan*, 242 F.3d at 1149 (ALJ properly rejected opinion, in

3   part, because the doctor "offered no objective medical findings" supporting opined limitations).

4   Further, Plaintiff does not dispute the ALJ's finding that his continued drug use was not severe

5   and not material to the disability determination.

6        Finally, although Plaintiff argues the ALJ failed to consider Dr. Abraham's reliance on his

7   "present" symptoms in forming her opinion, Pl.'s Mot. at 8, the Court rejects this attempt to

8   downplay the effect that Dr. Abraham's perception of Plaintiff's drug use had on her ultimate

9   opinion.  Dr. Abraham opined Plaintiff would have difficulty coping with work stress because

10   drugs served as his coping mechanism and such use amplified his symptoms, and she explicitly

11   referenced his hospitalizations in opining on his current functional abilities, even though his last

12   hospitalization occurred three and a half years prior to his alleged onset date.  AR 667-68.  Based

13   on this record, the Court finds the ALJ's rationale was reasonable and, even "[i]f the evidence can

14   reasonably support either affirming or reversing the [ALJ's] conclusion, the court may not

15   substitute its judgment for that of the [ALJ]." *Flaten*, 44 F.3d at 1457 (citation omitted); *Molina*,

16   674 F.3d at 1111 ("Even when the evidence is susceptible to more than one rational interpretation,

17   we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the

18   record").

19           **d.**     **Conclusion**

20        The Court finds the record as a whole constitutes substantial evidence supporting the

21   ALJ's decision to give Dr. Abraham's opinion little weight.  Accordingly, the Court finds the ALJ

22   did not commit reversible error.

23         **4.**     **Drs. Solomon and DeCubas**

24        Plaintiff next argues the ALJ erred by relying primarily on the opinions of Dr. Solomon

25   and Dr. DeCubas, non-examining medical sources.  Pl.'s Mot. at 9.  The ALJ gave "substantial

26   weight" to Dr. Solomon's opinion and "great weight" to Dr. DeCubas's opinion.  AR 26.  Plaintiff

27   argues their opinions "are inconsistent with treating and examining sources and should have been

28   accordingly given less weight."  Pl.'s Mot. at 9.  However, as discussed above, the ALJ properly

gave Dr. Montgomery's and Dr. Abraham's opinions little weight. Further, "[t]he opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957; *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (ALJ may reject the testimony of an examining physician in favor of a nonexamining, nontreating physician with specific and legitimate reasons for doing so); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a non examining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.").

Both Drs. Solomon and DeCubas reviewed Dr. Montgomery's treatment records. AR 106, 114-16. Dr. Solomon opined Plaintiff had no more than mild limitations in his daily activities, concentration-related abilities, and social functioning, relying on Dr. Montgomery's largely normal mental status findings to reach these conclusions. AR 109 (noting he had "fair" concentration, insight, and judgment but euthymic mood and was not seriously psychotic or depressed). In giving "substantial weight" to her opinion, the ALJ explained that Dr. Solomon's findings were consistent with the mental status findings in treatment records and the routine nature of treatment with medication refills. AR 26. As discussed above with regard to Dr. Montgomery, substantial evidence in the record supports these reasons. As to Dr. DeCubas, the ALJ properly gave "great weight" to his opinion that Plaintiff could perform some level of work activity based on his routine treatment, good activities of daily living, and improved functioning on medications. AR 26, 121-22. The ALJ also gave "some weight" to Dr. DeCubas's opinion that Plaintiff should have minimal contact with others and accommodated this by limiting contact with coworkers and the public in the RFC. AR 23, 26, 122. In sum, these doctors' narrative opinions, supported by substantial evidence in the record, constitute evidence upon which the ALJ could rely in finding Plaintiff's mental impairments were not disabling and in assessing the extent of his limitations in the RFC. 20 C.F.R. §§ 404.1527(c)(3), (c)(4).

Further, in his motion, Plaintiff failed to challenge any of the ALJ's underlying reasons for giving the respective weight he did to these doctors' opinions, focusing instead on why Dr.

Montgomery's and Dr. Abraham's opinions are entitled to deference. Pl.'s Mot. at 9-10. As such, Plaintiff waived any challenge related to the ALJ's reasoning. *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (finding party forfeited issue on appeal because "[b]eyond its bold assertion, [plaintiff] provide[d] little if any analysis to assist the court in evaluating its legal challenge") (internal citation omitted); *Thrasher v. Colvin*, 611 Fed. App'x 915, 918 (9th Cir. 2015) ("These arguments are waived because they were not raised in the opening brief."). The Court therefore finds the ALJ did not commit reversible error in relying on the State agency medical consultants' opinions, and the decision must be affirmed.

## D. PTSD

Plaintiff next argues the ALJ erred in failing to find PTSD as a severe impairment at step two. At this step, the ALJ determined Plaintiff had the following severe impairments: affective disorders and anxiety disorder. AR 21. Plaintiff argues that "[w]hile the record supports a finding of affective disorder and anxiety disorder as severe impairments, it also overwhelmingly documents a history of PTSD stemming from Mr. Plaintiff's childhood sexual abuse and other violent life experiences." Pl.'s Mot. at 10. He maintains that his "documented PTSD symptoms include intrusive memories/flashbacks, disturbance in mood, and distrust of others." *Id.* (citing AR 316-24, 404, 468-69, 600, 666, 669, 671, 675). In response, Defendant contends "the record clearly shows that [Plaintiff's] PTSD complaints were inconsistent, lacked corroborating objective findings, and he has failed to show *any* significant limitations on work abilities from PTSD." Def.'s Mot. at 11 (emphasis in original).

Step two serves as a "de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ is to determine whether the claimant has a "medically severe impairment or combination of impairments." *Id.* A severe impairment is that "which significantly limits [a claimant's] physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant has the burden at step two to show that he has a severe impairment. *Bray*, 554 F.3d at 1222.

Here, the Court finds the ALJ did not err in failing to find PTSD as a severe impairment. Although Plaintiff first saw Dr. Montgomery in November 2010, he first complained of PTSD in

March 2016.  *Compare* AR 380-99 *with* AR 404.  At that time, Plaintiff alleged that the triggering traumatic event was the drug dealer incident in 2012 and that it caused nightmares, paranoia, and the feeling that he is being "followed to this day."  AR 404.  However, while the drug dealer incident occurred in 2012, Plaintiff never complained of paranoia, nightmares, or PTSD at any visit from 2012 to March 2016.  AR 380-400.  Further, although Plaintiff now argues the record "overwhelmingly documents a history of PTSD stemming from Mr. Plaintiff's childhood sexual abuse and other violent life experiences," Pl.'s Mot. at 10, Plaintiff himself denied having any PTSD symptoms on numerous occasions in 2011.  AR 580, 607, 610-11.  Moreover, Dr. Montgomery appears to have diagnosed Plaintiff with PTSD at the March 2016 visit based entirely on his self-report regarding the 2012 incident, AR 404, and he never observed paranoid behavior in mental status findings after March 2016 and did not list PTSD as a source of any of Plaintiff's limitations in his opinion forms.  AR 402, 466, 470 (identifying bipolar disorder and social anxiety).

In addition, a diagnosis alone does not establish disability.  *Matthews*, 10 F.3d at 680 ("The mere existence of an impairment is insufficient proof of a disability."); *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999) ("Although the appellant clearly [has] diabetes, high blood pressure, and arthritis, there is no evidence to support his claim that those impairments are 'severe.'").  Further, Dr. Abraham was aware of Plaintiff's alleged PTSD from the drug dealer incident at time of her evaluation.  AR 667.  However, she found Plaintiff "failed to endorse these symptoms [of nightmares or paranoia] during testing" and she did not diagnose him with PTSD.  AR 667, 675.  Nor did Dr. Blank diagnose Plaintiff with PTSD following his evaluation, despite being aware of Dr. Montgomery's diagnosis.  AR 458, 461.  In short, while Dr. Montgomery diagnosed PTSD, the record as a whole does not support a finding that it is a severe impairment.  Regardless, whether an impairment "significantly limits [the claimant's] physical or mental ability to do basic work activities" is a finding that falls within the purview of the ALJ, not a physician.  20 C.F.R. §§ 404.1520(a)(4)(ii), (c).  Thus, Dr. Montgomery's diagnosis alone does not necessitate a finding of a severe impairment at step two.

Finally, even if the Court were to find the ALJ committed any error at step two,

United States District Court
Northern District of California

"[o]missions at step two are often harmless error if step two is decided in plaintiff's favor." *Martinez v. Berryhill*, 2017 WL 5900191, at *14 (N.D. Cal. Nov. 30, 2017) (citing *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005)). Here, any such error is harmless because the ALJ went on to address the concerns raised by Plaintiff at subsequent points within the five-step framework. *See Garcia v. Comm'r of Soc. Sec.*, 587 Fed. App'x 367, 370 (9th Cir. 2014) (any error in not identifying depression as severe at step two was harmless because "the ALJ proceeded through the entire sequential analysis, carefully considering all of [the] mental health records in assessing her [RFC]") (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence of limitations posed by claimant's bursitis at step four, any error in failing to consider bursitis severe at step two was harmless)). For example, at step three, the ALJ considered all of Plaintiff's mental impairments "singly and in combination," including his reports that he is "paranoid" AR 22-23. In determining Plaintiff's RFC, the ALJ considered Plaintiff's allegations of paranoia and PTSD, along with bi-polar disorder, social anxiety, attention deficit hyperactivity disorder, and schizophrenia. AR 24. Thus, any error in not identifying PTSD as severe at step two was harmless because the ALJ addressed the symptoms associated with PTSD at subsequent steps within the five-step framework. *See Brown v. Berryhill*, 2018 WL 4700348, at *14 (N.D. Cal. Sept. 29, 2018) (failure to address symptoms of cognitive disorder at Step Two was harmless error because the ALJ addressed many of the symptoms associated with the disorder at subsequent steps).

Accordingly, the Court finds the ALJ did not commit reversible error at step two, and the ALJ's decision must be affirmed.

**E.     Plaintiff's Credibility**

The ALJ evaluated Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his alleged symptoms and found that his allegations were not entirely consistent with the overall evidence in the record. AR 24-25. Plaintiff argues the ALJ failed to demonstrate that his statements regarding the severity of his symptoms should be rejected because "he did not offer much specifics as to why he found this to be so other than recounting parts of what was reported by Mr. Plaintiff throughout the medical record." Pl.'s Mot. at 11. Defendant responds that the

ALJ "provided multiple valid reasons for finding that [Plaintiff's] allegations of extreme symptoms were not entirely consistent with the objective medical evidence and other evidence in the record. Def.'s Mot. at 13.

### 1. Legal Standard

Congress expressly prohibits granting disability benefits based solely on a claimant's subjective complaints. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) (an ALJ will consider all of a claimant's statements about symptoms, including pain, but statements about pain or other symptoms "will not alone establish" the claimant's disability). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to [the Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). An ALJ is, however, required to make specific credibility findings. *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (the credibility finding "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").

A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc); 42 U.S.C. § 423(d)(5)(A)). A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282).

Second, if the claimant has met the first step and "there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Id.* (quoting *Smolen*, 80 F.3d at 1281). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record

lead to that conclusion." *Smolen*, 80 F.3d at 1284. Courts must not engage in second-guessing, where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record." *Fair*, 885 F.2d at 604. However, "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986), *superseded by statute on other grounds as recognized in Bunnel v. Sullivan*, 912 F.2d 1149, 1154 (9th Cir. 1990) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

Factors an ALJ may consider in weighing a claimant's credibility include: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Thomas*, 278 F.3d at 958-59 (quoting *Light*, 119 F.3d at 792). An ALJ's credibility finding must be properly supported by the record, and sufficiently specific to ensure a reviewing court he did not "arbitrarily discredit" a claimant's subjective testimony. *Id.* at 958 (citing *Bunnell*, 947 F.2d at 345-46).

### 2. Analysis

As to the first step, the ALJ found Plaintiff satisfied the first step as his "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 25. At the second step, although Plaintiff argues the ALJ "did not offer much specifics" as to why he found Plaintiff's symptom allegations to be inconsistent with evidence in the record, the Court finds the ALJ set forth four reasons for his finding.

First, the ALJ found the objective medical evidence did not support Plaintiff's allegation that his symptoms were disabling. AR 24-27; *see* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence is evidence . . . of medically acceptable clinical and laboratory diagnostic techniques" and "is a useful indicator" in evaluating symptom testimony). Plaintiff alleged disability based on bipolar disorder, PTSD, social anxiety, attention deficit hyperactivity disorder, and schizophrenia.

35

AR 24, 218. He testified to symptoms including extreme social anxiety around new people/surroundings, panic attacks, and anger. AR 66, 72-74; *but see* AR 675 (noting tendency to exaggerate for sympathy). However, the ALJ cited to objective evidence throughout the record that was at odds with these allegations. AR 24-27. The ALJ explained that providers found Plaintiff to have euthymic mood, fair judgment and insight, no thought disorders, and good memory upon mental status examinations, and Dr. Montgomery found he had appropriate affect, logical thought process, no hallucination, and good memory. AR 25-26; *see, e.g.*, AR 392-400, 404-13, 460, 659-64, 670. Dr. Montgomery's objective findings also consistently documented normal appearance, cooperative behavior, normal speech, intact associations, good "fund of knowledge," and full orientation to person, place, and time. AR 392-400, 404-13, 659-64. Although Plaintiff claimed his medication noticeably "impair[s]" him such that he cannot walk straight and makes him feel "not clear" or cloudy, he acknowledged that psychotropic medications helped control his emotions and his symptoms on a day-to-day basis. AR 50, 73-74, 80. The ALJ accommodated Plaintiff's symptom allegations to the extent they could fairly be reconciled with objective medical evidence, finding he had moderate limitation in interacting with others, which the ALJ accommodated in the RFC with a limited amount of interaction with others. AR 23 (relying in part on Dr. Montgomery's opinion as supporting the limitation). The Court finds the ALJ reasonably found the objective evidence did not support the remaining extent of Plaintiff's claimed limitations, which was a valid and proper consideration in evaluating his self-reported symptoms. AR 23-24, 26; *see* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work.").

As a second consideration, the ALJ relied on various inconsistent statements made by Plaintiff that conflicted with the extent of his alleged functional limitations. 20 C.F.R. § 404.1529(c)(4) ("[The agency] will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence . . ."); SSR 16-3p, 2017 WL 5180304, at *8 ("[the agency] will consider the

consistency of the individual's own statements"). Specifically, the ALJ noted inconsistencies in Plaintiff: (a) telling Dr. Montgomery that he felt "pressure from parent[s]" to apply for "[permanent] disability but [he] does not feel he is [permanently] disabled" (AR 24-25, citing AR 383); (b) describing his depression symptoms as mild-to-moderate or moderate, and his anxiety as moderate to severe, and repeatedly denying delusions, hallucinations, or suicidal ideations (AR 25, citing AR 380-400, 404-13, 659-64); and (c) alleging he could not work due to medication side effects, although he did not complain of any significant side effects in treatment notes (AR 25, citing AR 380-400, 404-13, 659-64). While Plaintiff does not address any of these inconsistent statements in his motion, the ALJ properly considered them. *Tommasetti*, 533 F.3d at 1039 (ALJ may consider "prior inconsistent statements concerning the symptoms"); *Molina*, 674 F.3d at 1112-13 ("Even where [the claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment") (citing *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1225 (9th Cir. 2010)).

Third, the ALJ found Plaintiff had "generally normal" daily activities, which was inconsistent with the functional limitations he alleged. AR 25. Although Plaintiff alleged extreme social anxiety that prevented him from leaving the house, panic attacks, anger outbursts, and difficulty concentrating (AR 66, 72, 236, 241), the record shows he was able to perform activities that exceeded these self-reported limitations. Plaintiff's daily activities included reading, painting, participating in art shows, creating a website for his art, watching television, and maintaining self-care. AR 23, 25, 77, 81-82, 237, 240, 404-05. He lived with his girlfriend, cleaned the house, cooked for himself, and attended Sunday dinners with his family. AR 23, 238, 240. Plaintiff left the house a couple times a day, including going to the grocery store at least once a week (and more when money permitted), and interacted with friends who lived in his complex. AR 82, 239. He attended medical appointments, for which treatment notes provided "little evidence that he had marked difficulty interacting with treating doctors or their staff." AR 23, 404-13, 659-64. Such activities are inconsistent with allegations of disability. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (concluding the ALJ's reasons for discrediting claimant's testimony

were sufficient when he said the "record reflects that the claimant has normal activities of daily living, including cooking, house cleaning, doing laundry, and helping her husband in managing finances. . . .  These activities tend to suggest that the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis."); *Mayes v. Massanari*, 276 F.3d 453, 457, 461 (9th Cir. 2001) (concluding claimant's "testimony that she could do many daily activities," including watching television, straightening up her house, and shopping, "suggested that she could also work").

Fourth, the ALJ found Plaintiff's treatment with Dr. Montgomery was "routine in nature, consisting of follow-ups and medication refills" and inconsistent with the allegedly disabling nature of his symptoms. AR 24-25.  "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007); *Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not disabling . . .").  While Plaintiff did seek treatment, the issue is whether the level of his treatment was commensurate with the extreme level of symptoms he has alleged. Dr. Montgomery kept Plaintiff on the same medications since October 2014 and same doses since September 2015.  AR 384, 392-400, 404-13, 659-64.  Plaintiff frequently reported some improvement with medications and testified that his medications helped with his anxiety/anger issues on a day-to-day basis.  AR 50, 73, 80, 392-95, 407-10, 459, 662-63, 667, 671.  While the longitudinal evidence included hospitalizations in the past, Plaintiff did not have any psychotic episodes or hospitalizations after his alleged onset date and after seeking continuous treatment from Dr. Montgomery, nor did he require any intensive treatment as might be expected if his symptoms were debilitating as he alleged.  20 C.F.R. § 404.1529(c)(3)(v) (ALJ may consider whether treatment other than medication has been received).  In sum, because Plaintiff's level of care and statements regarding the effectiveness of his medication were inconsistent with his allegations of disability, the ALJ properly discounted his self-reported complaints.  *Johnson*, 60 F.3d at 1434 (conservative treatment "suggest[s] a lower level of both pain and functional limitation").

Further, the ALJ's discounting of Plaintiff's symptom allegations was consistent with other

medical opinion evidence in the record. Dr. DeCubas opined that Plaintiff had greater functional ability than he alleged and could understand instructions, carry them out "moderately well," and was able to follow a schedule. AR 119. Dr. Solomon opined that Plaintiff's mental impairments fell in the non-severe range, in part because his past work required technical skills illustrating adequate concentration and he could perform his daily activities independently. AR 109. And while the ALJ found Plaintiff did have severe mental impairments at step two, Dr. Solomon's opinion nonetheless supports the ALJ's finding that his actual functional abilities indicated his symptoms were not disabling.

Based on the record as a whole, the Court finds the extent of Plaintiff's alleged limitations is unsupported by the objective medical and other evidence in the record. While Plaintiff may disagree with the ALJ's findings in this regard, such subjective disagreement is no basis for remand. *See Thomas*, 278 F.3d at 954 ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."). Further, even if the Court were to find that one of the ALJ's stated considerations was deficient, the Court must still affirm, as "several [Ninth Circuit] cases have held that an ALJ's error was harmless where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record." *Molina*, 674 F.3d at 1115; *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (ALJ's finding "[was] valid, despite the errors identified" because the errors did not "negate the validity" of the ultimate finding based on another ground).

Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence and free of legal error. Therefore, the Court must affirm the ALJ's decision.

## F.    Listings 12.04, 12.06, 12.15

Plaintiff next argues the ALJ erred in determining he does not meet Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and/or 12.15 (trauma and stressor-related disorders) at step three of the sequential evaluation.[8]

---

[8] Effective January 17, 2017, the agency revised medical criteria used to evaluate claims involving mental disorders (see Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg.

United States District Court
Northern District of California

Pl.'s Mot. at 12.  The ALJ found Plaintiff's mental impairments, considered singly and in combination, do not meet the listings requirements because Plaintiff has only mild or moderate limitations.  AR 22-23.  Plaintiff maintains the ALJ "reached his conclusion by largely relying on [his] reports of being able to complete certain simple activities of daily living such as reading, making art, watching television, having a girlfriend, spending time with family, and maintaining sobriety," but these activities "demonstrate very little about [his] ability to engage in competitive, full-time work."  Pl.'s Mot. at 12-13.  He argues there is "ample medical evidence from his long-time treating psychiatrist and a comprehensive psychological evaluation showing that [he] suffers from disabling impairments, and "[h]ad the ALJ correctly assessed [his] statement and correctly weighed the medical evidence of record, he would have found sufficient evidence to support a finding that [he] meets or equals Listings 12.04, 12.06, and/or 12.15."  *Id.* at 13.  In response, Defendant argues the ALJ properly evaluated the medical evidence and Plaintiff's symptom testimony, and therefore no Listing error occurred.  Def.'s Mot. at 21.  As to Plaintiff's argument that the ALJ relied on his reports of daily activities, Defendant maintains this cursory argument "ignores" the ALJ's numerous findings.  *Id.*

### 1.    Legal Standard

As noted above, at step three in the sequential process, an ALJ must consider whether a claimant's conditions meet or equal any of the impairments outlined in the Listing of Impairments, 20 C. F. R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The Listing of Impairments describes impairments that "would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity."  *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original).  If a claimant's "impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."  *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also* 20 C.F.R. § 404.1520(d).  The claimant bears the burden of establishing

---

66138, 66154, 66159 (Sept. 26, 2016)).  Because these changes rely on the date of the ALJ's decision, which issued after the effective date, the current version of the Listings applies in this case.  81 Fed. Reg. at 66138 n.1 ("[W]e will use these final rules on and after their effective date. . . .  We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.").

a prima facie case of disability under the Listing of Impairments. *Thomas*, 278 F.3d at 955; *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

An impairment meets a listing when all of the medical criteria required of that listing is satisfied. 20 C.F.R. § 404.1525(c)(3); *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."). "To equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment. . . ." *Id.* at 1099 (quoting 20 C.F.R. § 404.1526(a)).

"If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.* (citing 20 C.F.R. § 404.1526(a)). However, "'[m]edical equivalence must be based on medical findings," and "[a] generalized assertion of functional problems is not enough to establish disability at step three.'" *Id.* at 1100 (quoting 20 C.F.R. § 404.1526(a)).

## 2. Analysis

As an initial matter, the Court notes that Plaintiff's step three argument is essentially derivative of his prior arguments, namely that "[h]ad the ALJ correctly assessed [his] statement[s] and correctly weighed the medical evidence of record, he would have found sufficient evidence to support a finding that [he] meets or equals" a listing. Pl.'s Mot. at 13. But, as discussed above, the Court finds the ALJ properly evaluated the medical evidence and Plaintiff's symptom testimony. Further, although Plaintiff bears the burden of establishing a disability under the listings, he fails to distinctly argue or point to evidence showing that he medically equaled the criteria of any particular listing and instead only generally argues he "meets or equals" Listings 12.04, 12.06 and/or 12.15. *Id.* at 12. As such, the Court need only address his generalized argument that his impairments meet the criteria of a listed impairment. *See Crosby v. Comm'r of Soc. Sec.*, 489 Fed. App'x 166, 169 (9th Cir. 2012) (claimant waived argument that ALJ did not adequately consider whether his impairment equaled Listing 12.04 by failing raise the issue before

41

the district court) (citing *Greger v. Barnhart*, 464 F.3d 968, 973 (9th Cir. 2006)).

The listings for mental disorders are arranged into nine diagnostic categories. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00(A). The listings typically have three sets of criteria: paragraphs A, B, and C. *Id.* "The criteria in Paragraph A substantiate medically the presence of a particular mental disorder," whereas "[t]he criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *Id.* Only some of the nine diagnostic categories of mental disorders have paragraph C criteria, and those additional functional criteria are only considered if the paragraph B criteria are not satisfied. *Id.* The claimant "ha[s] a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) are satisfied." *Id.*

Plaintiff focuses on the ALJ's paragraph B findings. Pl.'s Mot. at 12. Under paragraph B, an ALJ rates a claimant's degree of functional limitation (none, mild, moderate, marked, or extreme) in four functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a; 20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.00.A.2.b, 12.00E, 12.00F, 12.04B, 12.06B. To satisfy the paragraph B criteria, a claimant's mental impairment must result in either an "extreme" limitation in one functional area or "marked" limitations in two of the functional areas. *Id.* § 12.00A.2.b.

Here, the ALJ found Plaintiff had mild limitations in understanding, remembering, or applying information, relying on Plaintiff's reports that he "spends his day reading, making art, watching television, indicating no significant difficulties in this domain." AR 23. In interacting with others, the ALJ found Plaintiff has moderate limitations, based on his reports that he is unable to get along with others and that he isolates, and therefore found he would "likely benefit from limited interaction with others, per report of his treating psychiatrist." *Id.* With regard to concentrating, persisting, or maintaining pace, the ALJ found Plaintiff has mild limitations, based in part on the fact that he had average IQ and maintained adequate concentration during various intellectual and mental status tests. *Id.* As for adapting or managing oneself, the ALJ found Plaintiff has experienced only mild limitations, based on reports that he "is independent in his self-

care, make[s] artwork, participate[s] in family activities, while maintaining sobriety from his long history of methamphetamine abuse." *Id.*

Plaintiff does not challenge these conclusions, but instead argues that the activities do not speak to his ability to work full-time. Pl.'s Mot. at 12-13. This misses the point, as the ALJ did not purport to find that Plaintiff could work without restriction based on these activities; rather, the ALJ rated the functional areas based on the evidence of record and included a limitation in the RFC to accommodate moderate limitation in interacting with others. AR 23. While Plaintiff might require further explanation from the ALJ, the Ninth Circuit has held it is "unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). In *Gonzalez*, the court affirmed the Commissioner's finding that the claimant was not disabled even though the ALJ had not stated what evidence supported his conclusion that the claimant's impairments did not meet or equal a listing. *Id.* at 1201. The court concluded that the ALJ's four-page evaluation of the evidence in other parts of the decision was sufficient to show the "foundations on which" he based his ultimate factual conclusions. *Id.* Similarly, in this case, the ALJ's discussion of Plaintiff's medical history, both in the context of the Listings and elsewhere in his opinion, is sufficient to show that he considered whether Plaintiff's impairments met or equaled a listed impairment. *See Daniel v. Berryhill*, 2019 WL 285200, at *3 (N.D. Cal. Jan. 22, 2019) (finding ALJ's Listings analysis satisfied where the ALJ's discussion regarding the medical evidence was contained in both her finding regarding the listings and the plaintiff's RFC); *Dixon v. Astrue*, 2010 WL 3766561, at *13 (N.D. Cal. Sept. 24, 2010) (ALJ's discussion of plaintiff's medical history throughout decision sufficient to show he considered whether plaintiff's impairments met or equaled a listed impairment).

Further, despite his general argument that he meets the listings, Plaintiff has failed to cite to evidence in the record establishing his impairment matches all of the specified medical criteria in any of the listings. [9] *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment

---

[9] As to Listing 12.15, while Plaintiff contends he meets or equals this listing, he devotes no substantive argument to how he satisfies *any* of its criteria. Regardless, as discussed above, the

43

matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests

only some of those criteria, no matter how severely, does not qualify.") (emphasis in original);

*Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) ("Listed impairments are purposefully set

at a high level of severity because 'the listings were designed to operate as a presumption of

disability that makes further inquiry unnecessary.'"). As Plaintiff has failed to articulate a

plausible theory regarding how the specific criteria of any listing is met or equaled, and the ALJ

sufficiently addressed why he failed to meet or equal a listed impairment, the Court finds the

ALJ's step three determination was without error.

## G.    RFC

Finally, Plaintiff argues the ALJ's assessment of his RFC is not based on substantial

evidence and fails to include all his limitations. Pl.'s Mot. at 13. The ALJ determined Plaintiff

had the RFC to perform a full range of work at all exertional levels but with the following

nonexertional limitations: limited to frequent contact with supervisors, coworkers, and the general

public. AR 23. Plaintiff maintains that, had the ALJ "considered the overall record and assigned

appropriate weight to [his] treating and examining providers, he would have determined that [his]

severe mental impairments prevent him from meeting the basic mental demands of unskilled work

on a sustained basis. Pl.'s Mot. at 14. Plaintiff argues he "exhibits a number of traits making it

impossible for him to perform basic work-related activities, but very notably has shown an

inability to consistently respond appropriately to supervision, coworkers, and usual work

situations." *Id.* (citing AR 50, 53, 66, 72-73, 83-86, 194-213, 242). Plaintiff also argues his RFC

is more accurately reflected in the second hypothetical posed to the vocational expert, and that the

ALJ erred by not incorporating those limitations in the RFC. *Id.* at 14-15.

In response, Defendant argues the ALJ properly evaluated the medical evidence and

Plaintiff's symptom allegations and substantial evidence supported the ALJ's findings in this

regard. Def.'s Mot. at 22. Defendant further argues that the ALJ's first hypothetical question

appropriately included the limitations the ALJ found supported by the evidence; and there is no

---

ALJ properly found that PTSD did not qualify as a "severe" impairment at step two.

evidence supporting Plaintiff's conclusion that "it is impossible" for him to perform basic work activities. *Id.* at 23.

### 1. Legal Standard

RFC is the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed by considering all the relevant evidence in a claimant's case record. *Id.*; *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). When a case is before an ALJ, it is the ALJ's responsibility to assess a claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."). "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Once again, the Court notes that Plaintiff's RFC argument is derivative of his prior arguments, namely that "[h]ad the ALJ considered the overall record and assigned appropriate weight to Mr. Plaintiff's treating and examining providers, he would have determined that Mr. Plaintiff's severe mental impairments prevent him from meeting the basic mental demands of unskilled work on a sustained basis." Pl.'s Mot. at 14. However, as discussed above, the ALJ properly evaluated the medical evidence and assigned appropriate weight to Plaintiff's treating and examining providers. As such, this argument is without merit.

As to Plaintiff's argument that the limitations in the second hypothetical should have been reflected in his RFC, the Court disagrees. In the first hypothetical, the ALJ asked the vocational expert whether an individual of Plaintiff's education and work background would be able to perform his past work if the individual's only limitation was frequently responding appropriately to supervisors, coworkers, and the public. AR 92. The second hypothetical included the following limitations:

> can never work at unprotected heights; can only work with moving mechanical parts occasionally; can never operate a motor vehicle. In understanding, remembering, and carrying out instructions, has difficulty in focusing on work and remembering and following instructions due to effects of medication; responding to supervisors,

coworkers, and the public only occasionally, dealing with changes in
work setting limited to simple work-related decisions.

AR 93.

The first hypothetical – upon which the ALJ ultimately relied – appropriately included the limitations the ALJ found supported by substantial evidence in the record. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (ALJ's reliance on the VE testimony was proper where "[t]he hypothetical that the ALJ posed to the VE contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record"); *Rollins*, 261 F.3d at 857 ("The omitted limitations, however, were only those that the ALJ found did not exist. Because the ALJ included all the limitations that he found to exist, and because his findings were supported by substantial evidence, the ALJ did not err in omitting the other limitations that [claimant] had claimed, but had failed to prove."). Although Plaintiff prefers the second hypothetical, the ALJ correctly found it is not supported by substantial evidence.

Further, the record does not support the conclusion that "it is impossible" for Plaintiff to perform basic work activities due to his "inability to consistently respond appropriately to supervision, coworkers, and usual work situations." Pl.'s Mot. at 14. While Plaintiff refers to leaving prior jobs due to problems getting along with others, these jobs pre-date his alleged disability onset date and are therefore of little consequence to the ALJ's analysis. *Turner v. Comm'r of Soc. Sec.*, 2015 WL 3546057, at *12 (N.D. Cal. June 5, 2015), *aff'd sub nom. Turner v. Berryhill*, 705 F. App'x 495 (9th Cir. 2017) ("Here, although Plaintiff disputes the ALJ's RFC finding, he largely relies upon his history of "troubled behavior," dating back to 1984, and cites little evidence of significant dysfunction during the relevant disability determination period."). The Court also notes that Plaintiff testified that his medication kept him from feeling confrontational or as anxious on a day-to-day basis. AR 50, 80, 247-48, 395. "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre*, 439 F.3d at 1006; *Sample v. Schweiker*, 694 F.2d 639, 642-44 (9th Cir. 1982) (mental impairments that are "amenable to control" are not disabling). And while Plaintiff claims his medication impairs his concentration to the point of preventing all work, this allegation is directly contradicted by findings from Drs. Abraham and Blank, who found intact

46

cognitive abilities, normal intellectual functioning, and (at most) mildly impaired concentration. AR 460-62, 670, 672, 676.

In summary, because an ALJ is "not required to incorporate evidence" from opinions or testimony that has been "permissibly discounted," and all the limitations supported by evidence in the record were incorporated into the RFC, the Court finds no error occurred and the ALJ's decision must therefore be affirmed.

## VI.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**

Dated: March 25, 2019

THOMAS S. HIXSON
United States Magistrate Judge